UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re<br>Richard J. St. Antoine and<br>Coleen A. St. Antoine, | Chapter 7<br><br>Case No. 14-30569-svk |
| In re<br>Jason Stankowski and,<br>Lisa Stankowski,<br>        Debtors. | Case No. 14-31193-svk |

| | |
|---|---|
| Milwaukee Builders Supply, Inc.,<br>        Plaintiff,<br>v.<br>Richard J. St. Antoine, et al.,<br>        Defendants. | Adversary No. 14-02630 |

| | |
|---|---|
| Three Sons Home Improvement, LLC,<br>        Plaintiff,<br>v.<br>Richard J. St. Antoine, et al.,<br>,<br>        Defendants. | Adversary No. 14-02631 |

| | |
|---|---|
| Milwaukee Builders Supply, Inc.,<br>        Plaintiff,<br>v.<br>Jason Stankowski, et al.,<br>        Defendants. | Adversary No. 14-02652 |

| | |
|---|---|
| Three Sons Home Improvement, LLC,<br>        Plaintiff,<br>v.<br>Jason Stankowski, et al.,<br>        Defendants. | Adversary No. 14-02655 |

## MEMORANDUM DECISION

This case involves the attempt by the principals of a failed remodeling business to discharge thousands of dollars of unpaid invoices to their suppliers, despite Wisconsin's theft by contractor law. The Debtors urge that the enhanced standard for defalcation adopted by the Supreme Court in *Bullock v. Bankchampaign, N.A.*, 133 S. Ct. 1754 (2013) dictates this result, but the suppliers vigorously disagree with the Debtors' reading of *Bullock*.

### I. Introduction and Jurisdiction

Richard St. Antoine and his wife, Coleen St. Antoine, filed a Chapter 7 bankruptcy petition on August 20, 2014. Jason Stankowski and his wife, Lisa Stankowski, filed a Chapter 7 petition on December 5, 2014. (Mssrs. Stankowski and St. Antoine are referred to in this Decision as the "Debtors"). Milwaukee Builders Supply, Inc. ("MBS") and Three Sons Home Improvement, LLC ("Three Sons") (collectively, the "Plaintiffs") filed complaints alleging that the Debtors committed fraud and defalcation in a fiduciary capacity and seeking a determination of nondischargeability under § 523(a)(4) of the Bankruptcy Code. (MBS Compls. ¶ 35; Three Sons Compls. ¶ 21.)

Determining dischargeability is a "core proceeding" as defined by 28 U.S.C. § 157(b)(2)(I). *See Stern v. Marshall*, 131 S. Ct. 2594 (2011). Whether the bankruptcy court can enter a money judgment on a nondischargeable debt is controversial, but at the start of the trial on June 17 and 18, 2015, the Plaintiffs and the Debtors expressly consented to this Court

determining dischargeability and entering a money judgment against the Debtors.[1] *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1946 (2015). This Memorandum Decision constitutes the Court's findings of fact and conclusions of law.

## II. Facts

The Debtors jointly owned, managed, and operated American Thermal Energy Corporation ("ATEC"). (Testimony of John Lambie, 6/17/15 at 9:52-9:53,[2] hereinafter Lambie, 17 at 9:52-9:53.) ATEC entered into agreements with homeowners for home improvement projects, such as roofing and windows. (Stankowski, 17 at 1:52.) MBS and Three Sons had an eight-year business relationship with ATEC. (Lambie, 17 at 9:51; Stankowski, 17 at 1:51.) MBS supplied ATEC with windows, window trim and other building materials. (Lambie, 17 at 9:48-9:50; St. Antoine, 17 at 11:09.) Three Sons provided ATEC with materials and crews of workers for installation services. (Elliott, 17 at 10:49; Stankowski, 17 at 1:52.) In 2014, when ATEC's principals filed for bankruptcy, ATEC owed $156,972 to MBS and $128,121 to Three Sons. (St. Antoine, 17 at 11:23, 1:35.)

The Debtors had expected ATEC to grow in 2014, but in December 2013, MBS and Three Sons stopped doing business with ATEC, and it did not recover. (St. Antoine, 18 at 10:07-

---

[1] Four adversary proceedings were consolidated for the purpose of trial (*Milwaukee Builders Supply, Inc. v. St. Antoine* (Case No. 14-2630), *Milwaukee Builders Supply, Inc. v. Stankowski* (Case No. 14-2652), *Three Sons Home Improvement, LLC v. St. Antoine* (Case No 14-2631), and *Three Sons Home Improvement, LCC v. Stankowski* (Case No. 14-2655)). The spouses of the ATEC's principals, Coleen St. Antoine and Lisa Stankowski, are also named as defendants in the adversary proceedings, but they were not involved in ATEC and were named to protect the Plaintiffs' claims against their marital property interests. (MBS Compls. ¶ 8; Three Sons Compls. ¶ 7.)

[2] Throughout this Memorandum Decision, all references to the testimony are to the Court's audio recordings available at CM/ECF docket no. 41 (for the June 17, 2015 portion) and docket no. 42 (for the June 18, 2015 portion).

-3-

10:09.)  Throughout their business relationship, ATEC was slow to pay MBS and Three Sons for supplies and labor.  (Lambie, 17 at 10:11.)  On December 16, 2013, John Lambie, president of MBS, visited ATEC to discuss the mounting overdue invoices.  (Lambie, 17 at 10:07-10:08.)  After they discussed ATEC's inability to bring the account current, Mr. Lambie told Mr. Stankowski that continuing the business relationship would require a new credit application from ATEC with Mr. Stankowski's personal guarantee.  (Lambie, 17 at 10:09.)  When Mr. Stankowski responded that he was unwilling to provide a personal guaranty of the business debt, Mr. Lambie replied that Mr. Stankowski had already committed theft by contractor under Wisconsin law.  (*Id*.)  The testimony differs on Mr. Stankowski's response to this accusation, but the parties agree that a few days later MBS and Three Sons terminated their business relationship with ATEC.  (*Compare* Lambie, 17 at 10:09, *with* Stankowski, 18 at 9:36-9:37.)  Shortly after, ATEC closed, and within months, the Debtors filed their bankruptcy petitions.

The Debtors both testified that prior to the December 2013 conversation with Mr. Lambie, they were unaware of the Wisconsin "theft by contractor" statute requiring ATEC to hold funds received from homeowners in trust for the benefit of ATEC's suppliers and subcontractors.  (Stankowski, 17 at 2:25; St. Antoine, 17 at 10:41.)  Indeed, the Debtors presented considerable evidence about their lack of sophistication in running a business.  Neither had any business training or even any formal education beyond high school.  (Stankowski, 18 at 9:35; St. Antoine, 18 at 9:46-9:47.)  The contractor trust fund was never discussed by ATEC and MBS or Three Sons until shortly before the business relationships terminated.  (Lambie, 17 at 10:19-10:20; Elliot, 17 at 11:04.)  The Debtors did not learn about the trust requirement through the course of their business or from the media.  (St. Antoine, 17 at 11:12-11:13; Stankowski, 18

-4-

at 9:35-9:36.) No evidence was presented that the Debtors had business licenses, prior experience or training that would have included knowledge of the theft by contractor law.

III.     Analysis

To prevail on a § 523(a)(4) claim, the Plaintiffs must establish "(1) that a trust existed; (2) that the Debtors were fiduciaries of that trust; and (3) that the Debtors committed 'fraud or defalcation' while acting as fiduciaries of the trust." *Chase Lumber & Fuel Co. v. Koch (In re Koch)*, 197 B.R. 654, 655 (Bankr. W.D. Wis. 1996). The Plaintiffs bear the burden of proving each element by a preponderance of the evidence. *Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)*, 895 F.2d 1170, 1172 (7th Cir. 1990).

A. A trust existed by virtue of Wis. Stat. § 779.02, and the Debtors were fiduciaries.

Wisconsin law creates a trust for funds paid by a homeowner to a contractor for the benefit of the subcontractors who provide labor and materials. Wis. Stat. § 779.02(5) provides:

> [A]ll moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor, services, materials, plans, and specifications used for the improvements, until all the claims have been paid. . . The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated.

Wis. Stat. § 779.02(5). *See Koch*, 197 B.R. at 655 ("The statute makes a contractor a trustee of funds received from an owner until the laborers, material suppliers, or subcontractors are paid for work or materials put into the specific improvement for which the payment was made."). As principals of ATEC, the Debtors were fiduciaries of the trust. *See* Wis. Stat. § 779.16.

-5-

Although not disputing that they did not use the homeowners' payments on particular jobs to pay applicable MBS and Three Sons invoices, the Debtors contend that, with the consent and cooperation of MBS and Three Sons, they paid older invoices with current homeowner payments. (St. Antoine, 17 at 1:39-1:40.) The Debtors claim that, fully aware that ATEC was paying late, MBS and Three Sons allowed this practice to go on for years. (Lambie, 17 at 10:11-10:16, 10:22.) By accepting the late payments until late 2013, the Debtors argue that MBS and Three Sons waived or should be estopped from making their claims under the theft by contractor statute.

Waiver is the intentional relinquishment of a known right. *Consumer's Co-Op of Walworth County v. Olsen*, 142 Wis. 2d 465, 492, 419 N.W.2d 211, 221 (1998). ATEC and MBS or Three Sons never directly discussed which invoices would be paid or what funds to use when making payments. (St. Antoine, 18 at 10:09-10:15.) Accordingly, in the absence of any evidence that MBS or Three Sons knew that ATEC was not paying invoices related to a specific job with the proceeds of that specific job, the record does not show that MBS or Three Sons intentionally relinquished the right to claim the benefit of the theft by contractor statute.

Nor have the Debtors proven estoppel. They argue that the acceptance of late payments by MBS and Three Sons should preclude them from now trying to enforce their rights under the theft by contractor law. "Estoppel arises when one party's conduct leads another to believe that a right will not be enforced and causes the one so misled to act to his detriment in reliance upon his beliefs." *In re Colonial Discount Corp.*, 807 F.2d 594, 599 (7th Cir. 1986). The Debtors strenuously maintained that they were unaware of the theft by contractor statute. Since they

were ignorant of the requirements of the law, it is disingenuous for them to argue that they relied to their detriment on the Plaintiffs' conduct in not enforcing their statutory rights.

### B. The Plaintiffs failed to prove defalcation.

The Plaintiffs have easily satisfied the first two elements in this case. But in order to prevail under current Supreme Court and Seventh Circuit precedent, the Plaintiffs must show either that the Debtors knowingly breached their legal obligation to hold the homeowners' funds in trust or that the Debtors were willfully blind to the statutory requirement. Their proof on this third element falls short.

In the context of § 523(a)(4), fraud and defalcation means "positive fraud in fact, involving moral turpitude or intentional wrong . . . and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." *Bullock,* 133 S. Ct. at 1759 (quoting *Neal v. Clark*, 95 U.S. 704, 709 (1877)). The Supreme Court included "not only conduct that the fiduciary knows is improper, but also reckless conduct of the kind set forth in the Model Penal Code." *Id.* The Court itself referred to this standard as "heightened." *Id.* at 1761. The Seventh Circuit Court of Appeals recently explained that, "'Defalcation' refers to the misappropriation of funds entrusted to one—a form of embezzlement. It differs from fraud in not requiring a false statement." *Stoughton Lumber Co. v. Sveum*, No. 14-3339, 2015 U.S. App. LEXIS 9315, at *2 (7th Cir. June 4, 2015) (citing *Bullock*, 133 S. Ct. at 1754). The Plaintiffs have not met their burden to prove fraud or defalcation under the heightened standard established by *Bullock* because the Debtors testified credibly that they did not know about their obligations to hold the funds paid by the homeowners in trust for MBS and Three Sons, and nothing in the record establishes that the Debtors were "willfully blind" to their duties as trustees.

-7-

a. <u>The Debtors did not have actual knowledge that they were trustees.</u>

One way the Plaintiffs could have met their burden to prove fraud or defalcation would have been to show that the Debtors had actual knowledge of their duties as trustees. *See In re Koch*, 197 B.R. at 658 (concluding that contractor's actual or constructive knowledge of theft by contractor statute or trust fund duties is material). But in their dealings with the Debtors, neither Mr. Lambie nor Mr. Elliot ever mentioned the statute or ATEC's obligations as a trustee until the bulk of the debt to the Plaintiffs had been incurred. (Lambie, 17 at 10:19-10:20; Elliot, 17 at 11:04.) No evidence indicates that the Debtors were educated on their duties as trustees. (Stankowski, 18 at 9:35-9:36; St. Antoine, 17 at 11:11-11:12.) The Debtors testified that they had not heard about the statute or their duties to act as trustees through the course of their business or from the media. (St. Antoine, 17 at 11:12-11:13; Stankowski, 17 at 1:58.) Neither had any business training or even any formal education beyond high school. (Stankowski, 18 at 9:35; St. Antoine, 18 at 9:46.) The Debtors did not hold licenses or take continuing education courses where they would have learned of the trust fund duties of general contractors. The Debtors were previously employed at a remodeling business called "Nu Sash," but their duties did not involve collection or payment of funds, and they did not learn of the trust fund statute. (Stankowski, 18 at 9:36; St. Antoine, 18 at 9:47.)

The Plaintiffs rely on the Debtors' apparent knowledge of the subcontractor lien rights provision of Wis. Stat. § 779.02, to evidence the Debtors' familiarity with the trust requirement of the statute. ATEC, however, was not a subcontractor. (St. Antoine, 18 at 9:48.) Although the Debtors wrote demand letters about enforcing liens two or three times, the Debtors never actually filed a lien claim or sued a customer. (St. Antoine, 18 at 9:48 and 10:05.) Mr. St.

-8-

Antoine testified that he created the demand letters by "Googling" intent to lien letters on the internet. (St. Antoine, 18 at 9:50.) The Debtors' minimal contact with the lien rights provision does not support finding that they knew of the part of the statute creating the trust fund.

This case is similar to *Koch* in the Plaintiffs' attempt to rely on the Debtors' experience "to support the inference that he had, or should have had, knowledge of the trust fund requirements and that his failure to pay over funds received from owners to Chase Lumber constitutes a more-than-negligent breach of fiduciary duty." 197 B.R. at 659. As in *Koch,* based on the Debtors' backgrounds and their demeanor as witnesses, this Court is not willing to draw such an inference.

> b. <u>The Debtors were not willfully blind to facts that would have led them to know that were trustees.</u>

In the absence of proof that the Debtors knew about the trust fund statute, the Plaintiffs could have proven defalcation by demonstrating that the Debtors deliberately avoided confirming that the statute contained a trust requirement. "Where actual knowledge of wrongdoing is lacking," conduct is considered to rise to defalcation "if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Bullock*, 133 S. Ct. at 1759 (citation omitted). The Supreme Court analyzed "willful blindness" in a civil context in *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011). There, the Court adopted a narrow definition, stating that "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 2070-71. The Seventh Circuit colloquially described the standard as: "he suspected he was violating

the law but avoided confirming his suspicion in order to preserve a patina of innocence." *Stoughton Lumber*, 2015 U.S. App. LEXIS 9315, at *6.

The Plaintiffs argue that the Debtors' knowledge of the lien rights portion of the statute proves that they were willfully blind to the trust portion of the statute. But the Debtors are not lawyers, and testified credibly that they did not read the statute. They merely searched for a lien enforcement form on the internet. (St. Antoine, 18 at 9:50.) ATEC never acted as a subcontractor, a business that more routinely enforces lien rights. (St. Antoine, 18 at 9:48.) The Plaintiffs' representatives, Mr. Elliot and Mr. Lambie, testified that they became educated on the trust fund law through the enforcement of lien rights. (Lambie, 17 at 10:01; Elliot, 17 at 10:49.) But Mr. Elliot testified that he would not discuss lien rights with clients like ATEC because of his fear that it would scare away potential business. (Elliot, 17 at 10:51.) The Debtors' limited interaction with the lien rights portion of the statute does not support finding that the Debtors were willfully blind to their obligations as trustees, a provision contained in another section of the statute.

In their Joint Trial Brief, the Plaintiffs pointed to the bankruptcy court's analysis in *Stoughton Lumber Co. v. Sveum* (*In re Sveum*), No. 12-15486, 2014 Bankr. LEXIS 4691 (Bankr. W.D. Wis. November 3, 2014), noting that it is "fundamental to construction law" that the funds received in payment for home building projects are to be held in trust for the benefit of subcontractors and suppliers. (Pls.' Joint Trial Br. at 6-7.) The Plaintiffs conclude that given the importance of lien rights in the construction industry, the Debtors must have deliberately avoided making the connection between the lien rights and the Debtors' obligations as trustees. But the

-10-

Case 14-02631-svk    Doc 36    Filed 07/10/15    Page 10 of 16

nature of ATEC's business, the personal circumstances and demeanor of the Debtors are all distinguishable from the homebuilder in *Stoughton Lumber*.

As described in the court of appeals' decision:

> The bankruptcy judge who presided at Stoughton's adversary proceeding didn't believe Sveum's protestations of innocence. An educated person with a college degree in business administration, Sveum had been in the building business for forty years and had supervised the construction and sale of hundreds of homes. Evidence presented in the adversary proceeding indicated that the statute's trust-fund requirement was generally known in the industry. In addition, it was inconceivable that Sveum didn't know that proceeds of the sale of a home or other building have to be held in trust for subcontractors of the builder.

2015 U.S. App. LEXIS 9315 at *5.

In this case, ATEC was a home remodeler – windows, siding, insulation, roofs – not a homebuilder. (St. Antoine, 17 at 1:49-1:50.) ATEC did not sell homes or deal with title companies. The Debtors were high school graduates who testified credibly that they did not know about the trust fund requirements of Wisconsin construction law. They found customers for small remodeling jobs and usually relied on MBS and/or Three Sons for materials and labor. They paid their bills slowly and by the Fall of 2013 had built up large balances to MBS and Three Sons. The Debtors admitted that they did not dispute the MBS and Three Sons invoices; they simply thought that at some point as the business grew, they would catch up with the payments. (*See* St. Antoine, 17 at 1:40-1:42, 18 at 10:07-10:10.) Unlike in *Stoughton Lumber*, nothing in the record supports the inference that the Debtors knew about or were "playing ostrich" concerning the trust fund statute. Another critical distinction between this case and *Stoughton Lumber* is this Court's determination that the Debtors' testimony that they did not

-11-

know about the theft by contractor law was credible, while in *Stoughton Lumber*, Judge Martin reached the opposite conclusion.[3]

At trial, the Plaintiffs tried to prove that the trust requirement was fundamental knowledge in the home improvement industry. MBS president, John Lambie, testified that he had long been aware of the statute after learning about it through lawsuits with other contractors. (Lambie, 17 at 10:01.) He also testified that other contractors have been convicted of committing theft by contractor and that it was "always an industry buzz." (*Id*.) The Court, after objection from Debtors' counsel, struck the "industry buzz" comment for a lack of foundation.[4] (Lambie 17, at 10:02.) Mr. Lambie was able to testify that he had been in contact with hundreds of suppliers and contractors and had spoken to those contractors and suppliers about the statute. (Lambie 17, at 10:02-10:03.)[5] On the other hand, Mr. Lambie's request for Mr. Stankowski's

---

[3] The Court of Appeals noted that Stoughton Lumber sued Sveum for theft by contractor in January 2011, and Sveum made no effort to learn about the requirements of the statute until July or August 2012, even though he was represented by counsel in the litigation. 2015 U.S. App. LEXIS 9315 at *6. Here, after Mr. Lambie told Mr. Stankowski about the theft by contractor violation, ATEC almost immediately ceased business. (St. Antoine, 17 at 11:11.)

[4] Counsel for MBS attempted to rehabilitate Mr. Lambie so that he could testify that the industry was well-aware of the statute, but the Court sustained the objection of the Debtors' counsel. (Lambie, 17, at 10:03-10:04.) The Court excluded Mr. Lambie's lay opinion testimony under Federal Rule of Evidence 403 because the evidence's probative value was minimal due to Mr. Lambie's self-interest on the question. In the absence of an independent witness from the home remodeling industry, and due to the dissimilarity between Mr. Lambie's and the Debtors' experience and businesses, this case does not feature evidence that the theft by contractor statute at issue here is generally known in the home remodeling industry. Additionally, even if the Court had allowed the testimony, the general knowledge that criminal charges can be brought against contractors who abscond with owners' payments and deposits does not equate to knowledge of the civil trust fund requirements of § 779.02.

[5] Mr. Elliot also testified concerning industry knowledge of the statute. Although the Court sustained the Debtors' counsel's objection to his statement that he never had a conversation with other contractors where they expressed an ignorance about the statute, it did allow Mr. Elliot to testify that ATEC was the first contractor who expressed ignorance about the statute. (Elliot, 17 at 10:50.)

-12-

personal guaranty does not support his testimony about his own or the industry's understanding about the theft by contractor statute. There was no need for the personal guaranty of ATEC's principals, because Wis. Stats. §§ 779.02(5) and 779.16 already render them personally liable.

The evidence supports that the Plaintiffs had some understanding of the statute and at least knew others in the industry who also did. But given the fundamental differences between the Plaintiffs' businesses and ATEC, the Plaintiffs' knowledge does not translate to the Debtors' knowledge, nor even to a general knowledge of the trust fund requirements in the home remodeling industry. ATEC did not act as a subcontractor or supplier and never had to sue a customer to enforce lien rights. (St. Antoine, 18 at 9:48.) Mr. Elliot, a subcontractor, testified that he learned about the statute within his first year of business when he consulted a lawyer about pursuing lien rights. (Elliot, 17 at 10:49.) Mr. Lambie similarly learned about the statute through lawsuits with other contractors. (Lambie, 17 at 10:01.) The Debtors rarely pursued lien rights and obtained their demand letter off of the internet. (St. Antoine, 18 at 9:48-9:50, 10:05.) Moreover, the Debtors lacked formal education. (Stankowski, 18 at 9:35; St. Antoine, 18 at 9:46.) The Court finds credible the Debtors' claims of ignorance about their obligations and finds that they were not willfully blind to critical facts that would have led them to learn that they had obligations as trustees to the Plaintiffs.

In reaching its conclusions, the Court carefully considered the evidence that Mr. St. Antoine made untrue statements of lien satisfaction on the loan applications he processed for homeowners. (St. Antoine, 17 at 12:05-12:14.) Plaintiffs' Joint Exhibit 121 is an example of a certification from November 8, 2013 for a $2,125 window and door project. The customer certified that the job had been completed to her satisfaction, and Mr. St. Antoine certified that

-13-

"All debts for labor, material . . . and other bills pertaining to the customer's contract have been paid in full and there will be no mechanic's materialman's or other lien(s) on customer's residence as a consequence of said installation." (Pls. Ex. 121 at 13.) This statement was false because the MBS invoice related to this job remained unpaid when ATEC closed its doors.

Mr. St. Antoine testified that he did not think he was doing anything wrong by signing the certification because he did not believe the customers were in danger of having a lien claim filed against them due to MBS and Three Sons' long history of accepting late payments. (St. Antoine, 18 at 10:04-10:07.) Although he could not point to an express instruction from either Plaintiff, Mr. St. Antoine thought MBS and Three Sons wanted payments directed to the oldest invoices, and that is how he made the payments. (St. Antoine, 17 at 1:40-1:42, 18 at 10:09-10:15.) Until termination of the relationship, it is apparent that the Debtors intended to pay MBS and Three Sons in full. (St. Antoine, 17 at 1:40-1:42, 18 at 10:07-10:10.) However, the Debtors believed that their obligations to the Plaintiffs were simple business debts. (Stankowski, 18 at 9:38.) They testified credibly that they did not understand that they had additional duties to MBS and Three Sons as trustees of a trust. The Debtors' misunderstanding that the debts owed to MBS and Three Sons were simple business debts cannot be equated with willful blindness in these circumstances.

The Plaintiffs also tried to prove that the Debtors were willfully blind to their obligations to act as trustees by presenting evidence that ATEC had been losing money and was paying other business expenses before paying MBS and Three Sons. Based on his review of the company's business records, John Peters, a forensic accountant, testified that ATEC had not been operating profitably since at least 2012. (Peters, 17 at 3:13, 3:23; Pls.' Ex. 126, at 2.) The Plaintiffs assert

-14-

that the Debtors were well aware that the company was losing money because ATEC received monthly profit and loss statements that showed negative retained earnings. (Pls.' Exs. 108, 109, 110; St. Antoine, 17 at 11:32-11:39.) The Plaintiffs also introduced evidence that ATEC paid salaries, overhead expenses, taxes, rent and loans for vehicles owned by ATEC that the Debtors' spouses used, instead of paying the debts owed to MBS and Three Sons. (St. Antoine, 17 at 11:54-11:59.) They conclude that the history of losses and ATEC's payments of other expenses evidenced the Debtors' willful blindness. But the record reveals a different reason. The Debtors' lack of sophistication, rather than willful blindness, explains their inability to understand the significance of concepts like a negative number in the retained earnings column. ATEC certainly understood that MBS and Three Sons had to be paid for the materials they supplied and the work they performed. (St. Antoine, 17 at 11:20-11:22, 1:40; Stankowski, 17 at 2:20). But given the parties' long history of late payments and the Debtors' sincere belief that the Plaintiffs eventually would be paid in full, (St. Antoine, 17 at 1:40-1:42, 18 at 10:07-10:10), the fact that ATEC paid other expenses ahead of MBS and Three Sons does not suggest that the Debtors acted with the knowledge that there was a substantial and unjustifiable risk that they were violating a fiduciary duty. Given the Debtors' credible testimony that they did not understand the extent to which ATEC was losing money and would not be unable to pay its debts to MBS and Three Sons, the Court cannot conclude that the Debtors' conduct shows that they were willfully blind to their trust obligations.

IV. Conclusion

For the reasons stated above, the Plaintiffs have not proven that the Debtors either had actual knowledge of their duties as trustees or were willfully blind to facts that would have

-15-

caused them to learn of their duties. Therefore, they have not met their burden of proof under Bankruptcy Code § 523(a)(4). The Court will enter separate orders dismissing the complaints.

Dated: July 10, 2015

By the Court:

Susan V. Kelley
U.S. Bankruptcy Judge

-16-